**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ARLINGTON DEVCO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 15 C 3558** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **T10 MELTEL, LLC, f/k/a** | ) | |
| **T10 UNISON SITE MGMT, LLC** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

In June 2011, the plaintiff purchased a building, which was formerly a hotel, in Arlington Heights, Illinois. Its plan was to transform the hotel into an apartment building. At the time of the purchase, there were a number of cellular carrier "tenants" – T Mobile, US Cellular, and Nextel are specified – operating their cellular equipment on the building's roof pursuant to leases. [Dkt. # 1-1, Page 10-79/116]. After its purchase of the property, the plaintiff entered into negotiations to sell the cellular leases and roof easement to the defendant. The plaintiff had plans for reconstructing the roof and adding a number of amenities. Because the cellular equipment was scattered all over the roof, the parties' negotiations included the plaintiff moving the equipment to a single location, and removing any outdated and abandoned equipment. The parties set up an incentive for the work to be done by the plaintiff by a certain date, with the defendant holding back $300,000 of the purchase price of the easement, which would then go to the plaintiff if its relocation work was completed on time.

The plaintiff didn't meet the deadline or even the agreed upon three-month extension of that deadline. Nonetheless, the plaintiff continued the relocation work, ultimately completing it a year

late. The defendant retained the $300,000 being held in escrow. The plaintiff then sued the defendant, claiming breach of contract regarding another holdback and unjust enrichment regarding the relocation of the equipment. Both sides have moved for summary judgment on the plaintiff's unjust enrichment claim. As the plaintiff sees it, even though it failed to meet the agreed-upon contractual deadline and complete its work within that time or in the three additional months the defendant granted it, the defendant still received the benefit of the plaintiff's work and thus, the theory goes, the plaintiff has been unjustly enriched by $300,000.[1]

As the defendant sees it, plaintiff contractually agreed to a deadline for moving the equipment and receiving the $300,000 payment. (The plaintiff had already been paid $1 million by the defendant for the leases). Plaintiff missed the deadline for moving the towers and can't skirt the contract and still be awarded the $300,000 through an unjust enrichment claim.[2]

---

[1] The plaintiff asked for $362,822.40 in its Complaint, but later, in the parties' Initial Status Report, conceded this was an error. [Dkt. #8, at 3].

[2] The parties have filed the required Local Rule 56.1 statements and responses. Without going too far off track into peripheral matters (or intending in any way to be critical), it must be said that there have been more than a few violations of the local rule, such as failing to cite to the record in support of a number of factual assertions and incorporating its entire 42-paragraph opening factual statement in its statement of additional facts, thereby violating the limit of just 40 additional facts set out in Local Rule 56.1(b)(3)(C). When taken to task by the defendant, the plaintiff was unapologetic. [Dkt. #45, at 1-3].

While one could call several of the defendant's objections to the plaintiff's factual assertions hypercritical, greater regard must be had for the Local Rules of any court than has been shown here. Indeed, plaintiff has submitted a courtesy copy of its Rule 56.1 Statement of Material Facts, which is voluminous, without a single tab to separate the exhibits. This is in violation of Local Rule 5.2(d). This has made it extraordinarily difficult to read and properly use the exhibits.

The Seventh Circuit has repeatedly emphasized the importance of a court's Local Rules and has held repeatedly that a district court is justified in demanding strict compliance with Local Rule 56.1, in particular. *Boss v. Castro*, 816 F.3d 910, 914 (7th Cir. 2016); *Flint v. City of Belvidere,* 791 F.3d 764, 767 (7th Cir.2015); *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015). It can be a tragic mistake for a party to decide the rules are not significant enough to apply to them. In this case, the court can overlook the plaintiff's insouciance, *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016)(court entitled to take flexible

continue...

Overlooked by the parties is the Supreme Court's decision in *US Airways, Inc. v. McCutchen*, _ U.S._, 133 S.Ct. 1537, 1546–47 (2013). Quoting the Restatement (Third) of Restitution and Unjust Enrichment (2011), the Court said: "'A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.'" As we discuss below, in those circumstances, adhering to the parties' arrangement yields "appropriate" as well as "equitable" relief.

**ANALYSIS**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)(emphasis supplied); *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016). This requires that "there be no *genuine* issue of *material* fact," and "the mere existence of *some* alleged factual dispute" will not defeat summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986); *Bordelon*, 811 F.3d at 989. The moving party bears the initial burden of production, and must inform the district court why a trial is not necessary. *Celotex Corp.*, 477 U.S. at 325; *Sterk v. Redbox Automated Retail, LLC,* 770 F.3d 618, 627 (7th Cir. 2014). The party opposing summary judgment must go beyond the pleadings to show that there is a genuine issue of fact that must be resolved with a trial.

---

[2]...continue
approach to enforcement of the local rules), because the defendant so clearly has the better side of this dispute.

It's also worth pointing out that the plaintiff's presentation has ignored Local Rule 26.2, which controls the filing of documents under seal. In filing its exhibits electronically in support of its motion for summary judgment, plaintiff has excluded a number of them claiming they are subject to a protective order. The plaintiff does not cite to any such order and failed to file the required motion to seal documents under the applicable Local Rule.

*Hassebrock v. Bernhoft*, 815 F.3d 334, 342 (7th Cir. 2016). "When, as here, cross-motions for summary judgment are filed, we look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007).[3]

The party claiming unjust enrichment has the burden of establishing the elements of its unjust enrichment claim. Under Illinois law, in order to sustain a claim of unjust enrichment, the complaining party has to show that the other party has "unjustly retained a benefit" "to [its] detriment, and that [the]...retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 832 (7th Cir. 2016). Indeed, "[i]t is now universally recognized that the principle central to all restitution awards is the principle against unjust enrichment...." Dan B. Dobbs, Remedies, 222—229 (West Publishing Co. 1973). The American Law Institute notes in Restatement Third, Restitution and Unjust Enrichment § 1(b) (2011): states: "[u]njust enrichment" is a term of art. The substantive part of the law of restitution is concerned with identifying those forms of enrichment that the law treats as 'unjust' for the purposes of imposing liability.... Unjust [ ] enrichment is enrichment that lacks an adequate legal basis. Unjust enrichment is a necessary element or precondition of the larger

---

[3] Since this case finds itself in the Northern District of Illinois, binding authority comes from the Supreme Court or the Seventh Circuit. *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994)("Opinions 'bind' only within a vertical hierarchy."); *Gacy v. Welborn*, 994 F.2d 305, 311 (1993); *Alliance to End Repression v. City of Chicago*, 820 F.2d 873, 875 (7th Cir. 1987)("A decision is authoritative when it is binding because of the hierarchy among courts, rather than solely because it is persuasive."). Yet, in briefing what it calls the "Applicable Legal Standard" for summary judgment, the plaintiff oddly cites not a single case from the Supreme Court, the Seventh Circuit, or even the Northern District of Illinois. All we find are citations to the First Circuit, the Second Circuit, and oddly the district courts of the Eastern District of New York, Nebraska, Connecticut, and West Virginia. [Dkt. #36, at 4]. Decisions of district courts are not authoritative even within the rendering district. *Van Straaten v. Shell Oil Products Co. LLC*, 678 F.3d 486, 490 (7th Cir. 2012); *Townsel v. DISH Network L.L.C.*, 668 F.3d 967, 970 (7th Cir. 2012). Why this method of briefing was chosen is not clear. Whatever the reason, it is not not helpful.

claim of restitution. The restitutionary claim affirmatively seeks the return of the benefit for which it would be unconscionable for the defendant to retain." Roy L. Brooks, *Postconflict Justice in the Aftermath of Modern Slavery*, 46 Geo. Wash. Int'l L. Rev. 243 (2014).

After reviewing the record the parties have complied, and the arguments they have advanced, it is clear that the plaintiff has not met its burden of proof, and that the defendant is entitled to summary judgment on Count II of the Complaint.

**A.**

As has been said, as part of their agreement for the sale of an easement to the roof of the building the plaintiff purchased, and given the plaintiff's plans for the roof, the parties' contract provided for the relocation of the cellular equipment. The parties staggered their negotiations into three agreements. They began with a "Terms of Agreement" dated May 8, 2012, which the parties acknowledged were "the business terms upon which this transaction will be completed . . . However, the terms are subject to due diligence and final Underwriting by [defendant], and receipt by [defendant] of all required documentation." [Dkt. #1-1, at 80]. Although it purportedly covered payments four years in the future, the contract was nevertheless set to expire in 6 months – November 2012 – unless extended by mutual consent. [Dkt. #1-1, at 80]. Under the "Terms of Agreement," the purchase price the defendant would pay for the 50-year easement was about $1.3 million. [Dkt. #1-1, at 80].

The payment was subject to deductions, holdbacks, and other closing conditions, [Dkt. #1-1, at 80], including a relocation holdback:

> In the event any one the [sic] Tenants agree to relocate but does not agree to pay for the move, Site Owner will pay for the relocation of each applicable Tenant, at a cost not to exceed $150,000.00/Tenant (noting Clearwire and Nextel for purposes of this

provision are deemed one tenant) (the "Holdback Amount"). Since the Closing shall take place in advance of the proposed relocation, the Holdback Amount shall be withheld from the Purchase Price for all Tenants at closing and shall be remitted to the Site Owner upon the completion of the relocation for each Tenant. A Holdback letter agreement shall be signed at closing confirming the conditions for remittance of up to $150,000 per each cellular company that agreed to relocate their equipment but did not pay for the move.

[Dkt. #1-1, at 81].

Two months later, in July 2012, the defendant wrote to plaintiff [Dkt. #39, ¶ 17], saying its letter would "serve as a record of [the parties'] mutual agreement" that defendant would fund escrow accounts to cover two holdbacks: a $362,822.40 Nextel Holdback and a $300,000 Relocation Holdback. The terms of the holdback at issue here, the Relocation Holdback, were as follows:

> 2. Relocation Holdback Amount. For a period not to exceed 12 months from the Closing Date, $300,000.00 ($130,000.00 for US Cellular, and $85,000.00 each for T-Mobile and Nextel (US Cellular, T-Mobile and Nextel, singularly, the "Tenant," collectively, the "Tenants") to be credited toward relocation costs in the event any one of the Tenants agree to relocate but do not agree to pay for the move."

[Dkt. #1-1, Page 92/116]. Plaintiff's representative signed the letter agreement on July 19, 2012. [Dkt. #1-1, at Page 97/116]. If the relocation wasn't timely completed, defendant could close the escrow and retain the $300,000 within 48 hours of the deadline. [Dkt. #1-1, Page 93/116].

That same day, the parties executed a "Wireless Communication Easement and Assignment Agreement." [Dkt. #1-1, Pages 99-116/116]. This Easement Agreement included details regarding the relocation of the cellular equipment – to be installed on the roof of the plaintiff's planned penthouse – and, again, indicated that the work would be done in twelve months. [Dkt. #1-1, Page 11-112/116]. The agreement included a provision stating that it "constitute[d] the entire agreement and understanding of [the parties] with respect to the subject matter of this Agreement, and

supersedes all offers, negotiations and any other written or verbal agreements . . . ." [Dkt. #1-1, at 104].

So, the plaintiff had until July 2013 to relocate the cellular equipment and reap the $300,000 holdback. In May of 2013, however, the plaintiff knew it wasn't going to make that deadline and wrote to the defendant, asking for a three-month extension to October 19, 2013. [Dkt. #40, Ex. F, Page 266/286]. The parties agree that the defendant gave the plaintiff the extension it sought: an additional three months. [Dkt. #37, ¶ 14; Dkt. #39, ¶ 28]. They also agree that the plaintiff was aware that there would be no further extensions. [Dkt. #37, ¶ 16; Dkt. #39, ¶ 28]. Finally, there is no dispute that plaintiff was unable to make the new deadline. In fact, the plaintiff didn't relocate the cellular equipment until September 1, 2014 – almost *a year* after the extended deadline passed. [Dkt. #36, at 2-3; #37, ¶ 14; #37-2, Ex. 4 (Trandel Dep.), at 38; Dkt. #39, ¶29]. On October 28, 2013, the defendant wrote and informed the plaintiff that it failed to meet the deadline, and defendant would be closing the escrow account and keeping the $300,000. [Dkt. #37-2, Ex. 8].[4]

---

[4] Plaintiff claims – and makes much of its claim – that the defendant was actively rooting for it to fail to meet the extended deadline so it could keep the $300,000. Defendant "rooting" for plaintiff to fail is neither here nor there unless it was taking action to hinder plaintiff's performance. It wasn't. Pure and unselfish motives are not necessary to contractual enforcement. Uncommunicated hopes on the part of one party is ineffectual and is not a valid reason for avoiding an otherwise binding agreement. *See Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 330–331, 371 N.E.2d 634 (1977); *Fratelli Gardino S.P.A. v. Caribbean Lumber Co., Inc.*, 587 F.2d 204, reh. denied 590 F.2d 333 (5th Cir. 1979). Whatever hopes the defendant may have harbored for the plaintiff's nonperformance of the three months extension (or of the original contract) are irrelevant.

In any event, the emails the plaintiff relies on for its "rooting" claim are merely a question from defendant's bank as to whether plaintiff would complete its work by the deadline or whether another extension on the escrow account, which was set to close on October 19, 2013, would be needed. Defendant's answer was: "I seriously doubt they are going to make it but we really can't release until we hit that trigger date." [Dkt. #37-2, Ex. 9]. That's not exactly "[t]roubling[] . . . rooting." [Dkt. #36, at 2]. But even if the defendant had the fondest hope that the plaintiff would not succeed, the plaintiff could not impose liability in this case under any theory, let alone unjust enrichment. *Steinberg, supra*; *Skycom Corp v. Telstar Corp.*,
continue...

Despite this, the plaintiff proceeded with its work relocating the cellular phone equipment. Why? Well, firstly, regardless of missing the deadline, plaintiff was still obligated to move the cellular equipment as part of its reconstruction of the roof. This was part of the easement agreement and part of what plaintiff agreed to provide in that easement, given that plaintiff was redoing the entire location of the cellular equipment. [Dkt. #1-1, Page 111-114/116; Dkt. #40, Page 138-41/286 (Ex. C, at 13-16)]. Plaintiff contends that once the defendant informed plaintiff that plaintiff missed the deadline and forfeited the $300,000, that terminated the parties' entire contract. But plaintiff points to nothing in any iteration of the parties' agreement that supports that thinking. The letter simply referenced the deadline and indicated that the plaintiff had not met the conditions for obtaining the $300,000 holdback. The letter in no way suggests that the parties' agreement is terminated.

Secondly – and oddly, given that the parties clearly agreed that plaintiff had to meet a deadline in order to receive the $300,000 holdback – even after receiving the defendant's deadline notice, the plaintiff took the position that the defendant was still on the hook for all payments upon completion of the relocation of the towers – regardless of the date it was completed, including the $300,000 for meeting the contractually agreed upon deadline. [Dkt. #37-2, Ex. 7, DEF0000573]. It's unclear why plaintiff might have thought that, but, apparently, this was the view it secretly held.

And thirdly, according to the plaintiff's manager, plaintiff had great plans for use of the roof space:

> . . . *[I]t was always contemplated* that we would effectively add a floor on the roof for building amenities. So up there we have a yoga studio, fitness center, a

---

[4]...continue
813 F.2d 810, 814 (7th Cir. 1987).

> demonstration kitchen, we have 5400 feet of outdoor patio space with fire pits . . . It's really quite elegant. And that . . . sits out on a newly constructed roof we built above the – a little taller than when we started.
>
> . . . the cell antennas were scattered. You know, they looked like there was no rhyme or reason to them. And so they were kind of just hung up there without any real orchestration, they were unsightly, and frankly they were exposed to the elements.

[Dkt. #37-2, Ex. 4 (Trandel Dep.), at 22](Emphasis supplied).

Similarly, plaintiff's expert, Mr. Marous, reported that if the plaintiff wanted to retain the building, it had to replace the old roof. [Dkt. #32, Page 3,10/33]. Plaintiff couldn't simply dump the leaseholders' equipment, however unsightly and inconsistent with plaintiff's plans for the roof. And so, as the plaintiff concedes, it gained a substantial benefit in moving the cellular equipment out of sight to a confined location. [Dkt. #36, Page 7]. But, according to plaintiff, so did the defendant. The plaintiff's expert performed what he has portrayed as a detailed analysis and, after considering multiple factors and variables, estimates the benefit to the defendant at "in excess of $300,000." [Dkt. #37, ¶18]. Now, one might call it serendipitous that the experts's calculations place the plaintiff – if it were to succeed in its unjust enrichment claim – in exactly the position it would have been if it hadn't failed to meet the deadline and the extended deadline by nearly a year. But regardless of whatever suspicion one might have of the equivalent of the plaintiff's claim and the expert's conclusion, the proper outcome of the plaintiff's motion does not depend on what one may think of that confluence of opinion. [5]

---

[5] Or, one might call it, unsurprising. Frequently, experts are little more than mouthpieces or hired guns. *Bodum USA, Inc. v. La Cafetiere, Inc*., 621 F.3d 624, 639 (7th Cir. 2010);*Tyus v. Urban Search Mgmt*., 102 F.3d 256, 263 (7th Cir. 1996). Judge Posner has said that once paid, "[t]here is hardly anything, not palpably absurd on its face that cannot now be proved by some so-called experts.'" *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 382 (7th Cir.1986). This is not a *Daubert* ruling on the admissibility of the plaintiff's expert's testimony, or a conclusion about him at all. It is merely an continue...

**B.**

"[W]hile [a] plaintiff may plead breach of contract in one count and unjust enrichment . . . in [an]other, it may not include allegations of an express contract which governs the relationship of the parties, in the count[] for unjust enrichment . . . ." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013). And, of course, there is the Supreme Court's recent and important statement in *US Airways, Inc.*, 133 S.Ct. at 1546–47, which bears repeating: " 'A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.' "

Yet, plaintiff has impermissibly alleged that the parties had "a written agreement wherein [defendant] would pay [plaintiff] $300,000 if the Cellular Carriers were moved to a new position on the Property's roof *by a certain date*" and has incorporated that allegation in its claim for unjust enrichment, not to mention attaching the written agreement it references to its Complaint. [Dkt. #1-1, ¶15 (emphasis supplied); ¶26; Ex. 3]. [6] The Seventh Circuit has explained that, in cases like this, "[a] plaintiff may plead as follows: (1) there is an express contract, and the defendant is liable for breach of it; and (2) if there is *not* an express contract, then the defendant is liable for unjustly enriching himself at my expense." *Cohen*, 735 F.3d at 615. But, as has been shown, a plaintiff cannot acknowledge throughout that there is an express contract, as the plaintiff does here, and still claim damages for unjust enrichment. *Id. See also Doyle v. Holy Cross Hosp.*, 186 Ill. 2d 104, 120 (1999)(Freeman, C.J., concurring in part, dissenting in part)("once it is established . . . that there is

---

[5]...continue
observation regarding his arriving at that same $300,000 figure as agreed to by the parties.

[6] Attaching the contract to the Complaint makes it a part of the Complaint. *Markadonatos v. Village of Woodridge*, 760 F.3d 545 (7th Cir. 2014); Rule 10(c), Federal Rules of Civil Procedure.

in fact an enforceable contract between the parties . . . then a party may no longer recover under the theory of promissory estoppel.")(cited in Plaintiff's Memorandum in Opposition, at 9).

"When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract." *Enger v. Chicago Carriage Cab Corp*., 812 F.3d 565, 571 (7th Cir. 2016); *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014). There is no dispute that the parties had a written agreement covering relocation of the cellular equipment. The relevant terms were simple: there was a deadline by which plaintiff had to move the cellular equipment or it would not receive the $300,000 holdback. (It had already received from the defendant $1 million for the sale of the leases on the cellular towers). The parties don't dispute that plaintiff didn't meet that deadline or the extended deadline. But plaintiff wants the $300,000 anyway, since, it says, it ultimately did the work – of which it may be noted it was the chief beneficiary.

According to the plaintiff, once the defendant informed plaintiff by letter that it was closing the escrow account and keeping the $300,000 due to plaintiff's contractual failure to meet the agreed-upon, extended deadline, the parties were in a new relationship. Plaintiff continued to work on the relocation, and defendant was aware that plaintiff continued to work and did not tell plaintiff to stop. [Dkt. #36, at 2-3; #41, at 3, 10]. But those are not controlling or relevant facts in this case. The defendant had communicated, in no uncertain terms, that plaintiff had missed the extended deadline and would not be receiving the $300,000 holdback. As already noted, plaintiff had plenty of reasons to continue the work even after it forfeited the holdback payment. Indeed, it was always going to redo the roof and install numerous amenities. [Dkt. #37-2, Ex. 4 (Trandel Dep.), at 22]. It really had no choice in the matter, and thus it was economic folly not to continue the relocation

project.

In order to succeed on a claim for unjust enrichment, a plaintiff must not only show that the defendant was enriched, but must "show a detriment—and, significantly, a connection between the detriment and the defendant's retention of the benefit." *Cleary v. Philip Morris Inc*., 656 F.3d 511, 518–19 (7th Cir. 2011). Here, if the defendant received a benefit as a result of the relocation of the cellular equipment, the retention of that benefit was not to the plaintiff's legal detriment because, as plaintiff's manager testified, the plaintiff would have performed the work anyway. *See Cleary*, 656 F.3d at 519 ("Since these consumers would have acted no differently had the defendants properly informed them about the true nature of cigarettes, their transfer of money to the defendants in exchange for cigarettes was not to their detriment—and, accordingly, the defendants' continued retention of the money cannot be to their detriment either.").

Moreover, unjust enrichment must be just that – unjust. *Empress Casino*, 831 F.3d at 832. "What makes the retention of the benefit unjust is often due to some improper conduct by the defendant. And usually this improper conduct will form the basis of another claim against the defendant in tort, contract, or statute." *Cleary v. Philip Morris Inc*., 656 F.3d 511, 517 (7th Cir. 2011). Indeed, in Illinois, unjust enrichment is not even a separate cause of action. "'Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct.'" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011). For example, a breach of a contract, or of a fiduciary duty, might create a situation in which someone has retained a benefit that ought to be disgorged based on principles of equity. *Pirelli Armstrong*, 631 F.3d at 447 (7th Cir. 2011). Here, the plaintiff brings

its unjust enrichment claim as a stand-alone cause of action, without any complimentary charges of fraud or breach of contract or fiduciary duty. Perhaps because there is none in connection with this case.

While an unjust enrichment claim does not necessarily require wrongdoing on the part of the defendant, the plaintiff must still show that the defendant's retention of the "profits would violate the fundamental principles of justice, equity, and good conscience." *Oshana v. Coca Cola Co.*, 472 F.3d 506, 515 (7th Cir. 2006). There's nothing remotely like that going on here. The plaintiff undertook to completely redo the roof of its new building and upgrade it with luxury amenities – no doubt because its perception of economic circumstances that required relocation of the (unsightly, to use the plaintiff's adjective) cellular equipment.

As part of its planned renovation of the roof of the building and its lease of the cell towers the plaintiff agreed it would move the equipment by a certain date in exchange for the release of a $300,000 escrow account. Plaintiff missed the deadline and the extended deadline, through no fault of the defendant. Defendant duly informed plaintiff that, because plaintiff didn't come through with its part of the bargain, defendant would be closing the escrow account and keeping the $300,000. As the plaintiff itself concedes: [i]n no uncertain terms, the Defendant then informed [plaintiff] that [plaintiff] was not entitled to Relocation holdback monies due to [plaintiff's] failure to meet the extended deadline." [Dkt #41, at 10]. After all, those were the very terms the parties agreed to. Plaintiff – quite naturally, given its plans for the roof – completed the relocation anyway. Whatever benefit plaintiff might have gained from the relocation of the cellular equipment, there's nothing to suggest that its retention of that benefit was or is inequitable or unjust.

None of the allegations plaintiffs offers in support of its contentions are convincingly

supported by evidence offered, in an effort to paint the defendant in an unflattering light. To paraphrase the pithy observations of Judge Moran which were quoted in *J.D. Marshall Int'l, Inc. v. Redstart, Inc*., 935 F.2d 815, 821 (7th Cir. 1991), adding more warts to a hog do not make it a dragon. Or to vary the example, calling a donkey's tail a leg doesn't mean the animal has five legs. *Blue Cross Blue Shield of Massachusetts, Inc. v. BCS Ins. Co.*, 671 F.3d 635, 638 (7th Cir. 2011)(Easterbrook, C.J.). So too here. Perhaps the defendant did harbor a wish that the defendant not meet the deadline and it could keep the $300,000. Assuming the truthfulness of the charge does not advance the plaintiff's position one millimeter. The parties are sophisticated businesses that made an arm's length transaction. That one side might harbor a hope to come out on top – to win, as it were – is neither surprising nor unusual, unless, that is, we are to disregard considerations of "inescapable human nature," *Hamdi v. Rumsfeld*, 542 U.S. 507, 545 (2004), and the history of our species on this planet. Of course, if people were angels, we would have no need of written contracts! In short, the uncertain and highly subjective standard of "troubling" subtly proposed by the plaintiff is not a proper one for determining contractual liability or unjust enrichment.

**C.**

"Enforceable contracts are vital to economic productivity," *Hoosier Energy Rural Cooperative v. John Hancock Life Insurance Co.*, 582 F.3d 721, 727 (7th Cir. 2009) and lie "at the foundation of all national life." *Farrington v. Tennessee*, 95 U.S. 679, 682 (1877). It is this recognition that in part accounts for the courts' historic refusal to rewrite contracts to accord with some ill-defined notion of fairness (often acquired in the light of subsequent developments) is deeply ingrained in judicial consciousness. The reasons are as sound as they are obvious. If judges were allowed to act as *post-hoc* revisory boards and to ignore the agreement of the parties in order to

relieve one of them from a hard bargain, voluntarily and honestly made, there would be created "an insecurity in business transactions which would be intolerable." *Effinger v. Kenney,* 115 U.S. 566, 572 (1885). "As Justice Brandeis recognized, '[p]unctilious fulfillment of contractual obligations is essential to the maintenance of the credit of public as well as private debtors.' " *United States v. Winstar Corp.,* 518 U.S. 839, 885 (1996). "While we recognize that a rule of strict compliance might lead to harsh results, such a rule tends to 'enforce [ ] commercial certainty.' " *Thomson Learning, Inc. v. Olympia Properties, LLC,* 365 Ill.App.3d 621, 631, 850 N.E.2d 314, 323 (2nd Dist.2006).

This policy of upholding the integrity of written contracts – where possible and otherwise appropriate – is particularly relevant in cases such as this involving complicated, written contracts between sophisticated corporations, represented by skilled counsel. Such parties should be held to the terms of their written undertakings whenever it is proper to do so. The Seventh Circuit's observations in *Binks Mfg. Co. v. National Presto Industries, Inc.*, 709 F.2d 1109, 1116 (7th Cir. 1983) bear repeating:

> "'The morass of business dealings between two companies described on this record, their promises oral and written, the disparity of their understandings, the frustration of expectations, the inevitable recriminations and conflicting memories—all this is not unique, new, or infrequently encountered. The law in its effort to facilitate just resolutions of such controversies has, over the centuries, developed certain aids or guides to decision.... The first is the substantive principle that when, in the course of business transactions between people or corporations, free and uncoerced understandings purporting to be comprehensive are solemnized by documents which both parties sign and concede to be their agreement, such documents are not easily bypassed or given restrictive interpretations.'" [7]

**D.**

Plaintiff also complains that, even after the deadline passed and the defendant closed the

[7] The court was quoting the First Circuit's decision in *Intern. Business Machines v. Catamore Enterprises,* 548 F.2d 1065, 1073 (1st Cir.1976), *cert. denied,* 431 U.S. 960 (1977).

escrow account and told plaintiff it was keeping the $300,000 under the parties' agreement, the defendant still expressed desires that the relocation of the cellular equipment would be completed. [Dkt. #38, at 3; #41, at 10]. In support of this contention, plaintiff cites Exhibit 11, which is a collection of 50 pages of emails. [Dkt. #37, ¶ 38]. Even if the defendant's desire that the equipment would eventually be moved were relevant, it does not change the result. "Citations to an entire transcript of a deposition or to a lengthy exhibit are not specific and are, accordingly, inappropriate." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004). In any event, to the extent review of the jumble of emails is possible, the gist is that the defendant was acting as a go-between for the plaintiff and the cellular companies, T-mobile in particular. The emails demonstrate, not so much the defendant's desires, but those of the cellular companies who were understandably interested in where their equipment was going to be moved and when.

Plaintiff's final contention is that "[t]he Defendant, between October 19, 2013 and September 1, 2014, was always aware that [plaintiff] continued performing the relocation work *with the expectation that plaintiff would be paid the Relocation Holdback monies.*" [Dkt. #36, at 3 (emphasis supplied)]. Plaintiff provides no evidence to support this assertion, and it is not a part of its Local Rule 56.1 statement of facts. [Dkt. #37, ¶¶37-41]. Plaintiff is unable to point to anything in the record that suggests that plaintiff, at any time after the extended deadline had expired and the plaintiff had received notice from defendant, told the defendant that it was moving the cellular equipment with the expectation that it would still receive the $300,000 holdback despite its failure to live up to its contractual obligations. On the other side, the defendant clearly informed the plaintiff that it would not be getting the $300,000 because it missed the deadline.

This is a summary judgment proceeding. As the Seventh Circuit has bluntly put it, it's "put

up or shut up time." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1077 (7th Cir. 2016). A moving party cannot simply throw out unsupported contentions against the wall in the vain hope that one of them might stick. It has to support those allegations with evidence. *Id.*; *Hassebrock v. Bernhoft*, 815 F.3d 334, 342 (7th Cir. 2016).

Throughout the law, deadlines count. *See, e.g., Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp*., 284 F.3d 693, 700, 709 (7th Cir. 2002); *Finwall v. City of Chicago*, 239 F.R.D. 494, 496 (N.D. Ill. 2006). Plaintiff was subject to a deadline in this case – a contractual deadline that the plaintiff and the defendant had been posed on themselves with the advice of counsel. The defendant bargained for plaintiff to complete the relocation of the cellular equipment by a certain date; if plaintiff made the deadline, it got $300,000. If it missed the deadline, the contract freely entered into between the parties did not provide that the plaintiff would nonetheless get the $300,000. Plaintiff missed the deadline, and the extension, badly. It completed the work anyway because it was always part of plaintiff's plan to do so – a plan dictated no doubt by the economic necessities of the situation. Now, plaintiff wants to be paid for that work exactly as it would have been paid if it had complied with the contract. That's not a claim for unjust enrichment; it is rather the claim of a party who made a deal that it has not lived up to. The law of contracts does not permit a "do over" to advantage the nonperforming party.

It should come as no surprise that the plaintiff's lawyers has presented a number of arguments in his client's favor. "A lawyer with an intense determination to win will, simply by his virtue of the essential facts of human nature, spend enormous amounts of time on a case to make certain that he is presenting his client's views and arguments in the best possible light." *Compare Harkless v. Sweeny Indep. Sch. Dist., Sweeny, Tex.*, 608 F.2d 594, 597 (5th Cir. 1979). But that does not mean

that victory always accompanies the effort. Here it does not.

## CONCLUSION

Acceptance of the plaintiff's arguments would lead to a new method of analysis in contract cases – or at least in certain contract cases. Henceforth, the measure of success in a summary judgment setting would be whether the party seeking summary judgment had acted in a way that the other party found "troubling" or "unfair." Even in years past a judge sitting in equity could not "succumb to the temptation to substitute his own 'incandescent conscience,' H. Shanks, The Art and Craft of Judging: The Decisions of Judge Learned Hand 13 (1968), for the long established methods of thought found by other judges over an extended period to be the proper mode of analysis. Legal jurisdiction is not a floating commission to do good or to remake the world. Nor is it a limitless fount of power which invests judges with unfettered discretion to decide cases in accordance with their private notions of justice. Even equity cannot vary like the Chancellor's foot. *Albermark Paper Co. v. Moody*, 422 U.S. 405, 407 (1975).

The defendant's motion for summary judgment on Count II of the plaintiff's complaint is granted, and the plaintiff's motion for summary judgment on that count is denied. It is not for a court paternalistically to rewrite a party's agreement to include terms that they chose not to make a part of their agreement, *United States v. Bethlehem Steel Corp.,* 315 U.S. 289, 311–312 (1942); *Hoosier Energy Rural Electric Cooperative, Inc. v. Amoco Tax Leasing IV Corp.,* 34 F.3d 1310, 1317 (7th Cir.1994). There is a strong presumption against provisions that easily could have been included in the contract but were not. *Cress v. Recreation Services,* 341 Ill.App.3d 149, 185, 795 N.E.2d 817, 851 (2nd Dist.2003).

**ENTERED:** ______________________________
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 2/27/17